UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FELICIANO FITZ, CARMELO BAEZ,
JESUS BAEZ, MIGUEL VASQUEZ, and
OSCAR PORTILLA,

                        Plaintiffs,

        - against -

BETHEL GOURMENT FOOD CORP.,
YEONG Y. KIM, PYUNGHAK KIM,
YONG M. OH, and 79 DELI NY CORP.,
jointly and severally,

                        Defendants.

**ORDER**

17 Civ. 8919 (PGG)

---

PAUL G. GARDEPHE, U.S.D.J.:

          Plaintiffs bring this action under the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"), seeking damages for unpaid minimum and overtime wages, spread of hours pay, failure to provide wage notices and statements, and retaliation, in connection with their employment at a convenience store owned and operated by Defendants. The parties reached a settlement in April 2018, in which Defendants Bethel Gourmet Food Corp. ("Bethel") and Yeong Y. Kim, Bethel's owner and manager, agreed to a settlement of $500,000, which they agreed would be reduced to the amount of Defendants' available assets, as determined by an independent audit. The independent audit is now complete, and pending before this Court is Plaintiffs' motion that this Court find Defendants' available assets to be in excess of $500,000, and enter a judgment for the full settlement amount. (Dkt. No. 61)

          For the reasons stated below, Plaintiffs' motion will be granted, and judgment will be entered in the amount of $500,000.

## BACKGROUND

**I.     PROCEDURAL HISTORY**

The Complaint was filed on November 15, 2017. (Dkt. No. 1) Plaintiffs name Bethel and Yeong Kim as Defendants, and assert eight causes of action under the FLSA and NYLL, for unpaid minimum and overtime wages, spread of hours pay, failure to provide wage notices and statements, and retaliation. (Id.)

On January 29, 2018, this Court referred this case to the SDNY mediation program. (Dkt. No. 13)

On April 9, 2018, the parties submitted a fully executed "Stipulation and Order of Settlement" (the "Settlement Agreement"). (Dkt. No. 19) The Settlement Agreement provides for a "Full Settlement Amount" of $500,000, including attorneys' fees and costs. (Settlement Agreement (Dkt. No. 19-1) § 1.1) Defendants Bethel and Kim represented that they did not have sufficient assets to pay the Full Settlement Amount, however, and the parties agreed that Defendants would be liable for only the amount of their Available Assets, up to a maximum of $500,000. (Id. § 2.1) Notwithstanding this stipulation, Defendants agreed to pay $50,000 to Plaintiffs within ten days of this Court approving the Settlement Agreement. (Id. § 3.2)

Defendants "agreed to the appointment by the Court of an independent auditor ('Auditor') to determine the amount of the Available Assets" and also agreed to "pay the cost of the Auditor[.]" (Id. § 2.3) Defendant further agreed to cooperate fully with the Auditor. As noted above, the parties agreed that "[i]n the event that the Auditor determines that Available Assets are not sufficient to pay the Full Settlement Amount, the Full Settlement Amount shall be reduced to the Amount of the Available Assets." (Id. § 2.4) Defendants also agreed to pay $50,000 in attorneys' fees to Plaintiffs' counsel, and to deposit $10,000 in escrow for the

Auditor.  (Id. §§ 3.2, 3.3)  Finally, Defendants agreed that the Complaint would be amended to add as Defendants Pyunghak Kim (Yeong Kim's husband), Yong M. Oh (a relative of the Kims), and 79 Deli NY Corp. ("79 Deli").  (Id. § 7.4)  The Settlement Agreement was executed by each Plaintiff, by Defendants Bethel and Yeong Y. Kim, and by Pyunghak Kim, Yong M. Oh, and 79 Deli NY Corp.  (Id. at 7, 9)

On July 16, 2018, this Court directed the parties to propose an independent auditor.  (Dkt. No. 20)  On July 30, 2018, "[a]s per the settlement agreement entered into by the parties in this matter," this Court appointed Bryan Ban – Defendants' choice (see Dkt. No. 22) – as the independent auditor.  (Dkt. No. 23)

In a January 7, 2019 letter, Plaintiffs complained that Defendants had not made the $50,000 minimum guaranteed payment or the $10,000 escrow payment, and about the delay in completing the audit.  Plaintiffs requested that this Court replace Ban as the auditor.  (Dkt. No. 25)

On January 14, 2019, the parties submitted a January 10, 2019 letter from Ban. (Dkt. No. 27)  Ban's letter explains that, despite Defendants' representation in the Settlement Agreement that they had not transferred assets since October 1, 2017 (see Settlement Agreement (Dkt. No. 19) § 2.1), they had actually transferred assets on two occasions.  (Ban Jan. 10, 2019 Ltr. (Dkt. No. 27-1))  On or about January 1, 2018, Yeong Kim invested $50,000 in Defendant 79 Deli NY Corp. ("79 Deli"), which is owned by her brother, Yong Oh.  Despite this transfer of assets, Ban stated that "[i]t appears that [the] original owner is still running the business."  (Id. at 1)[1]  On or about January 5, 2018, Yeong Kim sold her personal residence, resulting in proceeds

---

[1] The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

3

of $91,000.35, which she wired to a relative's bank account in Korea.  (Id.)  Ban states that "these transactions were motivated with the intent not to pay the settlement amount."  (Id.)

At a January 17, 2019 conference with the parties and Ban, this Court relieved Ban of his audit duties and appointed Andrew M. Park in Ban's place.  Park was also proposed by Defendants.  (Dkt. No. 32)

On March 28, 2019, Plaintiffs requested a pre-motion conference concerning a proposed motion to file an amended complaint, for a preliminary injunction, and for the appointment of a receiver.  (Dkt. No. 33)  On April 30, 2019, this Court requested briefing concerning the proposed motion. (Dkt. No. 34)  On May 6, 2019, Plaintiffs submitted a letter in support of their application.  Defendants made no submission.  (Dkt. No. 34)

On July 9, 2019, Plaintiffs moved to file an Amended Complaint which adds Pyunghak Kim, Yong M. Oh, and 79 Deli NY Corp. as defendants.  Plaintiffs' motion is consistent with Section 7.4 of the Settlement Agreement.  (Dkt. No. 36)

On November 25, 2019, this Court conducted a conference regarding difficulties Auditor Park was experiencing in obtaining relevant documents from Defendants' accountant.

On December 17, 2019, this Court granted Plaintiffs' request to file an Amended Complaint, noting that Defendants had not objected to this request at the November 25, 2019 conference.  (Dkt. No. 51)

On December 24, 2019, Plaintiffs filed the Amended Complaint.  (Dkt. No. 55)

## II.     THE AMENDED COMPLAINT

As noted above, the Amended Complaint adds as Defendants Pyunghak Kim, Defendant Yeong Kim's husband and – like her – a co-owner/manager of Defendant Bethel.  (Id.

¶¶ 28-29)  The Amended Complaint also names as Defendants 79 Deli – the alleged successor entity to Bethel – and Yong Oh, the owner of 79 Deli.  (Id. ¶¶ 32-35, 37)

The Amended Complaint alleges that on November 28, 2017, Defendant Oh – a relative of the Kim Defendants – created 79 Deli.  (Id. ¶ 6)  According to the Amended Complaint, Bethel's assets were transferred to 79 Deli, and 79 Deli now operates the same store that Bethel operated, and employs one of the Plaintiffs.  Bethel was dissolved on September 23, 2018.  (Id. ¶¶ 6-7, 25)  Plaintiffs allege that the Kims and Bethel – as original employers – and Oh and 79 Deli – as successor employers – constitute a single enterprise and are joint employers. (Id. ¶¶ 40-41)  Accordingly, Plaintiffs allege that Oh and 79 Deli have successor liability.

### III.   THE INDEPENDENT AUDITOR'S REPORT

On August 31, 2020, Park submitted his audit report (the "Audit Report") to the Court.  (Audit Rpt. (Dkt. No. 61-3))  The Audit Report notes several scope limitations, which reflect Park's lack of access to relevant information.

As an initial matter, the parties stipulated to a valuation cut-off date of June 30, 2019,[2] but documents that would have been current as of that date were not provided to Park, including bank statements for cancelled checks, cash register tapes, and loan documentation.  No financial documents concerning Oh, the current owner, were provided.  (Id. at 12-13)

Given the lack of documentation, Park requested a full-day site visit to observe transactions and determine whether the amount of cash transactions he observed was consistent with the records that had been provided.  (Id. at 14)  Defendants only allowed Park one hour to observe cash and credit transactions at the store, however.  During that hour, the ratio of cash to

---

[2]  Auditor Park also notes that the parties agreed that the valuation cut-off date should not be changed to account for the impact of the COVID-19 pandemic.  (Id. at 15-16)

credit transactions was 68% cash to 32% credit.  This cash to credit ratio is significantly different from the 20 to 30% cash to 70 to 80% credit ratio asserted by current store manager Pyunghak Kim.  (Id.)  Accordingly, the Audit Report contains two analyses posited on different cash to credit ratios.  Scenario 1 is based on the cash-to-credit ratio Park observed at the store, and Scenario 2 is based on the ratio claimed by Pyunghak Kim.  (Id.)  The Audit Report notes that Defendants "did not provide any supportable explanation or documentation related to the Company's cash transactions," and that Kim "was not able to explain his internal control process."  (Id. at 18)

Park further notes that he had difficulty obtaining information from Defendants' accountants, who ultimately "failed to provide satisfactory substantiation for many of [Park's] questions, specifically the cash transactions related to the business and complete documentation[] for [Defendants'] related party transactions."  (Id. at 15)

After describing these limitations on his access to relevant information, Park makes the following findings:

> According to my interview with Mr. Pyung Kim and Ms. Yeong Kim, 79 Deli is essentially a continuation of Bethel.  After the sale of Bethel, the business has not changed any aspects how they conducted their operations.  The Company still operates in the same location with the same personnel, selling the same merchandise and while continuing to be actively managed by Mr. Pyung Kim and Ms. Yeong Kim's leadership.  In addition, the same customers and vendors were noted.  Although Bethel and 79 Deli are separately incorporated with different ownership, they are merely two different entities under which Mr. Pyung Kim and Ms. Yeong Kim engage[] in the same convenience store business.  Therefore, I am considering the two entities as if they are a single business for purposes of my analysis.

(Id. at 17)  Accordingly, throughout the Audit Report, Park refers to this "single business" as the "Company."

The Audit Report finds that Defendants have liquid assets of $82,327, and liabilities of $24,489, resulting in net liquid assets of $57,838.  (Id. at Ex. 1)  Park also concludes

6

that Defendants have not accounted for $21,000 in proceeds from the sale of the Kims' residence. While the Kims claim that these funds were used to repay a loan they had received from Yong Hee Hong, they provided no documentation whatsoever concerning this alleged loan. (Id. at 22) Accordingly, the Audit Report concludes that Defendants' available assets, excluding the fair market value of the Company, are $78,838. (Id. at 23 & Ex. 1)

The Audit Report finds that the fair market value of the Company is, under Scenario 1, $216,000, and under Scenario 2, $457,000. (Id. at 46) In arriving at these valuations, Park uses two modes of analysis: a Capitalization of Earnings method (to which he assigns 80% weight), and a Mergers and Acquisitions method (to which he assigns 20% weight). (Id.)

Park explains that he used the Capitalization of Earnings method because "[m]anagement was not able to provide . . . projections for operating revenue, expenses and profitability"; "the Company has been in existence since approximately October 29, 1991" and "[t]he revenue stream has been relatively consistent"; and "[t]he majority of the Company's expenses are variable, and as the Company grows, expenses as a percentage of revenue is expected to remain relatively constant." (Id. at 41) Park accounts for "Bethel's company specific risk [to calculate its] cost of capital," relying on its "long history of operations since 1991" and the fact that the "lease for the operating facility is expected to expire in January 2020." Park concludes that the Company's cost of equity is 18%. (Id. at 42) Park then calculates the cost of debt and appropriate capital structure – or ratio of debt to equity – in both scenarios, determining that the Company's weighted average cost of capital ("WACC") is 13.5% for both scenarios. (Id. at 43) Park then forecasts future cash flows, based in part on the assumption that revenue will grow 3% per year. (Id. at 44) To estimate revenue and expenses in

7

Scenario 1, Park used "the financials stated by Mr. Pyung Kim and the outside accountants."  For Scenario 2, Park used his own "observation of the cash sales at the operating facility."  (Id. at 34)  Park found total revenue in 2019 of $842,807 under Scenario 1, and total revenue of $1,902,522 under Scenario 2.  (Id. at 35)  Using the Capitalization of Earnings method, Park finds that the fair market value of the Company is $222,000 under Scenario 1, and $490,000 under Scenario 2.  (Id. at 44)

For the Mergers and Acquisitions method of valuation, Park identified fifty comparable transactions for each scenario, using multiple industry databases.  (Id. at 46)  Using this method, Park concludes that the fair market value of the Company is $193,000 under Scenario 1 and $327,000 under Scenario 2.  (Id.)

Park determined – based on "the judgment of the appraiser and not on any prescribed formula" – that the Capitalization of Earnings method should be given 80% weight, versus 20% weight for the Mergers and Acquisitions method.  (Id.)  Based on this formula, Park concludes that the fair market value of the Company is $216,000 under Scenario 1 and $457,000 under Scenario 2.  (Id.)  With the addition of the liquid assets, Defendants' Available Assets amount to $294,838 under Scenario 1, and $533,838 under Scenario 2.  (Id. at 47)

## IV. THE SEPTEMBER 10, 2020 CONFERENCE AND THE PARTIES' BRIEFING CONCERNING VALUATION

On September 10, 2020, the Court conducted a conference concerning the Audit Report.  At that conference, this Court questioned Park and counsel about the limitations placed on Park's observation of cash transactions:

> THE COURT:  You say in your report that you were only allowed to observe the cash transactions at the store for one hour and that it was your wish to actually spend the day observing the store's cash transactions.  Could you tell me what knowledge you have on this point[?]

MR. PARK: Yes, your Honor, that is correct. Initially we did -- I did request for more, at least one full day, in addition to business sales receipts, cash receipts. So that was in addition. Eventually the one hour was what I was, you know, eventually was told, that that was the limitation that I was provided, so we went ahead with the one hour. And then I went, stood in the corner, tried to be not disruptive with the business as much as possible, stayed – literally stayed in the corner. Mr. Jeon was there also, one of [Defendants'] counsel, observing us, and "us" meaning me and an associate.

. . . .

THE COURT: When I asked you who it was that told you that you had an hour, you started by saying that you thought it was [Defendants' counsel] Ms. Lee, and then I think you said that it could have been Mr. Jeon. Is that what you said?

MR. PARK: Yes, your Honor. I just confirmed and verified on an email on February 6th, 10:30 a.m., from Mr. Jeon to myself, [Ms.] Lee, and [Plaintiffs' counsel] Mr. Restituyo. It said the site visit has to be an hour and limited to one hour.

THE COURT: All right. You say Mr. Restituyo was on that email as well?

MR. PARK: Yes, your Honor.

THE COURT: All right. So what's the story, Mr. Restituyo? Did you agree to this one hour or not?

MR. RESTITUYO: Your Honor, I apologize. As I said previously, this case has been like pulling teeth, and even the simplest of investigations has taken forever, so basically after – by the way, we had been in Mr. Park's office just a couple of days prior and negotiating this, this very point ad nauseam, and I don't believe I responded. I was like, okay, whatever, anything to get this case moving. So I guess the answer is, whether I knew it was an hour, I guess via that email, I would have known that it was an hour. Whether I consented to the hour, I was very much opposed to it previously, but anything was better than nothing to get this thing moving.

THE COURT: All right. Ms. Lee, you wanted to say something about the cash receipts?

MS. LEE: Yes, your Honor. The time that we picked from 12 to 1 was part of the negotiations. We picked the business hour – busiest hour, which is the lunch hour. And the point that I wanted to make was that there is a construction nearby so during the lunch hour many of the construction workers who would normally not be part of the business customers came in and bought their lunch using cash. So that kind of explains the spike in cash sales during that time. So the other thing that I wanted to say is, as far as the cash portion of the business is concerned, according to the accountant for the business, in about 15 to 20 percent,

9

> which is more accurate, in our opinion, than Mr. Park's assessment of cash transaction, which is 68 percent of the business. I think that is based exactly on that one hour. And the other thing, the receipts, the end of the receipts, show the sales – what do you call it – as cash register tapes, at this point, your Honor, I have no idea why that was not turned over. My understanding was that that was turned over, at the end of the day. So, I mean, that I can certainly get into with Mr. Park if he wants to change his report and his opinion. At this point I have no idea why cash register tape was not provided to Mr. Park at the end of the day.

(Sept. 10, 2020 Tr. (Dkt. No. 66) at 9:9-12:24)

Park then explained the different analyses represented by Scenario 1 and Scenario 2, as set forth in the Audit Report:

> MR. PARK: Scenario 1 represents the financials of Bethel of sales provided, cash sales provided, based on my interview with the defendants. So during my interview, the defendants provided how much their cash sales were. I included that cash sale based on what was provided to me at the interview. That represents [S]cenario 1. Scenario 2 represents the cash sales that I have assumed based on my observation of that one hour, which is 68 percent cash, 32 percent credit. So that [S]cenario 2 represents my assessment based on the one hour, and I have grossed up the cash sales at 68 percent. That represents [S]cenario 2.

(Id. at 14:9-20)

After the September 10, 2020 conference, this Court issued an order directing the parties to submit briefing concerning the amount of assets available to Defendants for the payment of a judgment. (Dkt. No. 60)

On September 24, 2020, Plaintiffs filed the instant motion requesting that judgment be entered in the amount of $500,000. (Dkt. No. 61) Defendants subsequently made submissions challenging that amount. (Dkt. Nos. 62, 63, 65)

## **DISCUSSION**

Plaintiffs contend that this Court should find that Defendants have available assets amounting to more than $500,000, and therefore should enter judgment in the amount of $500,000. (Pltf. Sept. 24, 2020 Ltr. (Dkt. No. 61) at 5) Defendants Bethel, Yeong Kim, and Pyunghak Kim cite a number of alleged weaknesses in the Audit Report, but do not offer an

10

alternative estimate.  (Sept. 25, 2020 Kims Ltr. (Dkt. No. 63))  Defendants 79 Deli and Oh argue that this Court should find that Defendants have $57,906 in available assets.  (Sept. 24, 2020 79 Deli Ltr. (Dkt. No. 62) at 3)

The Court notes, as an initial matter, that the parties are bound by the Settlement Agreement that they executed.  The Settlement Agreement provides for a settlement amount of $500,000, subject to the following limitation:  "In the event that the Auditor determines that Available Assets are not sufficient to pay the Full Settlement Amount, the Full Settlement Amount shall be reduced to the Amount of the Available Assets."  (Settlement Agreement (Dkt. No. 19-1) § 2.4)  The parties thus agreed to be bound by the Auditor's determination as to whether assets of $500,000 or more were available to Defendants to pay a judgment.

As discussed above, Defendants' failure to provide relevant documentation to the Auditor, and insistence that Park observe transactions at the store for no more than an hour, significantly limited Park's access to information.  Because of these limitations, Park presented valuations to this Court under two scenarios.  Scenario 1 is based on Defendants' self-reported volume of cash transactions, while Scenario 2 is based on Park's own one-hour observation of cash transactions at the store.  (Sept. 10, 2020 Tr. (Dkt. No. 66) at 14:9-20)  The available assets under Scenario 1 total $294,838; the available assets under Scenario 2 amount to $533,838.  (Audit Rpt. (Dkt. No. 63-1) at 47)

Scenario 1 does not provide a reliable basis for determining Bethel's fair market value.  As Park notes in the Audit Report, Pyunghak Kim "did not provide any supportable explanation or documentation related to the Company's cash transactions," and Kim "was not able to explain his internal control process."  (Id. at 18)  And Defendants' accountants did not "provide satisfactory substantiation for many of [Park's] questions, specifically the cash

11

transactions related to the business and complete documentation[] for their related party transactions." (Id. at 15)  This Court cannot rely on Defendants' unsupported statements regarding cash transactions in making a determination as to the fair market value of the Company.

By contrast, this Court finds that Park's analysis under Scenario 2 yields a reasonable estimate of the Company's fair market value.  Moreover, any uncertainty as to the result under Scenario 2 is the product of Defendants' failure to provide relevant documents, Defendants' accountants' refusal to cooperate with the audit, and Defendants' unreasonable restrictions on Park's opportunity to observe cash transactions at the store.  Given that this Court twice chose an independent auditor recommended by Defendants, their refusal to cooperate with the auditors is particularly unreasonable.

Defendants' arguments for a valuation less than $500,000 are not persuasive.

Defendants first argue that "Bethel is currently operating under a month-to-month lease[, and so] the actual value of the business should be limited to the business's inventory, the accounts receivables, if any, the current market value of fixtures and its bank account . . . . With the information provided in the Report, we may conclude that the current value of . . . Bethel would be $57,906[.]"  (Sept. 24, 2020 79 Deli Ltr. (Dkt. No. 62) at 2; see also Sept. 25, 2020 Kims Ltr. (Dkt. No. 63) at 1)  Park was aware that the lease for the store was month-to-month, however.  Indeed, he mentioned that fact three times in the Audit Report, and explicitly accounting for it in determining Bethel's cost of equity.  (Audit Rpt. (Dkt. No. 63-1) at 26, 28, 42)  Park also noted that the store had operated continuously since 1991, which he similarly factored into Bethel's cost of equity.  (Id. at 42)  In sum, Park's valuation cannot be rejected on the grounds that he did not consider the month-to-month lease factor in determining valuation.

Defendants also complain that Bethel's "net income was created by the reduced 'Compensation of Officers' by $18,000 compare[d] to year 2017 and 2016," and that "[e]ven with the normalized adjustments . . . the annual net income is only $17,050, $3,099, $27,013, $3,280, and $25,376 in fiscal years from 2015 through 2019, respectively."  (Sept. 24, 2020 79 Deli Ltr. (Dkt. No. 62) at 2)  According to Defendants, "the financial conditions of the owners of Bethel can be compared to the poverty threshold level[.]"  (Id.)  But Defendants offer no specific reason to question Park's methodology, other than its outcome.  The mere fact that the valuation appears high relative to one aspect of Bethel's financial condition – net income – is not a reason to set aside the valuation.

Defendants further argue that "Bethel's revenue has substantially [declined] . . . during the COVID-19 [pandemic].  Oh believes that Bethel has no future and the net income is almost at a level where discontinuation would be more preferable."  (Sept. 24, 2020 79 Deli Ltr. (Dkt. No. 62) at 2)  Both sides agreed to a valuation cut-off date of June 30, 2019, however, and that cut-off date was confirmed by the parties at a June 23, 2020 meeting among Park, Plaintiffs' counsel, and Defendants' counsel – despite Park's recommendation to change the cut-off date to June 30, 2020.  (Audit Rpt. (Dkt. No. 63-1) at 15-16)  Having chosen to abide by the June 30, 2019 cut-off date, Defendants cannot now complain that the impact of the COVID-19 pandemic has not been factored into the Audit Report.

Defendants also contend that "one of the Company's weaknesses is that it heavily relies" on the Kims' involvement, and that because the Kims are aging and suffer from health conditions, they "may choose to retire" if the Company is no longer theirs.  (Sept. 25, 2020 Kims Ltr. (Dkt. No. 63) at 1-2)  The Audit Report explicitly acknowledges that Bethel's reliance on the

Kims constitutes a threat to the Company, however. (Audit Rpt. (Dkt. No. 63-1) at 28) Park nevertheless arrived at the valuations discussed above.[3]

Defendants further complain that Park's Scenario 2 estimate of 68% cash transactions, based on one hour of observation, is "misleading," because "a large number of construction workers nearby purchased lunch using cash." (Sept. 25, 2020 Kims Ltr. (Dkt. No. 63) at 2) In this regard, Defendants submit four days of transaction records, which they say demonstrate that cash transactions constitute 10% of sales. (Id.)

The one-hour-at-noon restriction was imposed by Defendants, however, and they will not be heard to complain now that the time period they imposed led to an inaccurate estimate of cash transactions. Defendants had ample opportunity during the audit to address Park's requests for documents concerning their cash transactions, and could have permitted him to observe transactions at the store for more than one hour. Having done neither, Defendants ask the Court to rely on unaudited cash transaction records to second-guess Park's valuation. The Court will not do so.

Defendants also complain that Park improperly "included [the Kims'] individual assets and liabilities without explanation." (Oct. 8, 2020 79 Deli Ltr. (Dkt. No. 65) at 2) Defendants further assert that "[t]he net proceeds from the sale of [the] Kims' house in Old Tappan, NJ was fully distributed to payoff [the] Kims' preexisting indebtedness." (Id.) The Kims' personal assets were properly considered in the Audit Report, however, because each is a named Defendant and each executed the Settlement Agreement in his or her individual capacity. (Settlement Agreement (Dkt. No. 19-1) at 7-9) As to the proceeds of the house sale, Park

---

[3] In any event, Defendants do not explain how Park should have accounted for the Kims' involvement in either the Capitalization of Earnings or Mergers and Acquisitions methods of valuation.

14

concluded that $70,000 of the $91,000 in proceeds was not "available," because a lender had submitted an affidavit stating that he had loaned the Kims $70,000.  (Audit Rpt. (Dkt. No. 63-1) at 21)[4]  As to the remaining $21,000, however, Defendants provided Park with no documentation.  (Id. at 22)  Accordingly, his decision to include the $21,000 in available assets is entirely reasonable.

Given the findings of the independent auditor – as set forth in the Audit Report – the Court concludes that Defendants have available assets of $500,000 or more.

In a last ditch effort to avoid a judgment, Defendants 79 Deli and Oh offer "to close the business."  They suggest that "the business may be sold and . . . the full sales proceeds [given] to the Plaintiff[s] as a settlement[,] or just transfer the ownership of Bethel to the Plaintiff[s]."  (Sept. 24, 2020 79 Deli Ltr. (Dkt. No. 62) at 2)  This Court will not entertain Defendants' eleventh-hour attempt to re-write the Settlement Agreement.

## **CONCLUSION**

For the reasons stated above, this Court finds that Defendants have available assets of $500,000 or more.  Pursuant to the parties' Settlement Agreement (Dkt. No. 19-1), judgment in the amount of $500,000 will be entered against Defendants, jointly and severally.

---

[4] Park reached this conclusion even though "[t]here were no loan agreements or documentation to indicate" the terms of the loan.  (Id.)

The Clerk of Court is directed to terminate the motions (Dkt. Nos. 61, 65), enter judgment for Plaintiffs in the amount of $500,000, and close this case.

Dated: New York, New York
       October 14, 2020

SO ORDERED.

*[signature: Paul G. Gardephe]*

Paul G. Gardephe
United States District Judge